## PRYOR et al. v. GREENE.

### In re WATSON.

(Circuit Court of Appeals, Fourth Circuit. September 29, 1924.)

No. 2248.

1. **Fraudulent conveyances** ⬦162(1)—**Transfer voidable as preference under South Carolina statute.**

In order to avoid a transfer of property by an insolvent as a preference, under the Assignment Law of South Carolina (Civ. Code, 1922, § 5511), it is not necessary to show that the beneficiary, as well as the insolvent, had knowledge of his insolvency, and participated in the intent to create a preference.

2. **Fraudulent conveyances** ⬦88 — **Mortgage held voidable as preferences under state statute.**

A mortgage to secure a prior indebtedness, given by bankrupt when insolvent on his own initiative, as one of several transfers covering substantially all of his property, and intended by him to given preference to certain creditors, which was prima facie invalid, under Civ. Code, S. C. 1922, § 5511, held not valid as executed pursuant to a prior agreement constituting an equitable lien, where the parties were relatives, and there had been only general talk between them of security, with no definite agreement as to time or kind of security.

3. **Fraudulent conveyances** ⬦88—**Transaction between relatives claimed to create equitable lien closely scrutinized.**

Where a transaction claimed to create an equitable lien, which validated a subsequent mortgage, was between parties closely related by family connection, and living as one family. while the law will not presume a fraudulent purpose, the relationship demands that the facts be closely scrutinized and the agreement definitely and specifically established.

Appeal from the District Court of the United States for the Western District of South Carolina, at Anderson, in Bankruptcy; Henry H. Watkins, Judge.

In the Matter of C. Manley Watson, bankrupt; G. B. Greene, trustee. W. S. Pryor and Mrs. Lena Pryor appeal from a decree of the District Court, holding a mortgage invalid under the state statute. Affirmed.

The following is the opinion and order of the District Judge upon petitions for review of the order of the referee:

"This matter comes on to be heard before me upon two petitions for a review and reversal of the order of the referee, wherein certain mortgages, attempted to be established as liens upon real estate of the bankrupt, were set aside and declared void under section 5511 of the Civil Code of South Carolina. One of the petitions was filed on behalf of Mrs. Corrie Watson, mother of the bankrupt, and the other by W. S. Pryor and his wife, Mrs. Lena Pryor, his father-in-law and mother-in-law. At the hearing before the referee, objections were filed against the approval of the alleged liens of the mortgages, not only on the ground of their being given in violation of the assignment law of the state, as set forth in section 5511 of the Civil Code of 1922, but also on the ground that they were without consideration and were void under the statute of Elizabeth. The referee held that the notes, which the mortgages were given to secure, were executed for valuable consideration, and that the mortgages were not invalidated under the provisions of the statute of Elizabeth. He held, however, that the mortgages were given in violation of the assignment law as set forth in the section of the South Carolina Code above referred to. No objection is made to the correctness of his decision as to the consideration of the notes, nor as to his determination upon the effect of the statute of Elizabeth, and his decision in those particulars is amply sustained by the decisions.

[1] "The only question, therefore, before me is whether the mortgages are invalid because given in violation of the assignment law of the state. The record is a voluminous one, and an investigation and determination of the testimony, as well as an investigation and determination of the law, has entailed considerable study. I am indebted to counsel for the unusually clear and able arguments, which were presented both orally and in writing, in support of their several contentions. It is evident that the case was gone into most thoroughly by the referee, whose elaborate and able opinion so fully and convincingly sets forth the reasons for his conclusions as to require but little, if anything, to be added to what he has said. One of the chief legal controversies in the case was whether under the as-

signment law of the state it was necessary in order to avoid the preference created that the beneficiary as well as the insolvent should have been aware of his insolvency and should have participated in the intent to create a preference. The opinion holds that such is not the law and sustains this view with ample and convincing citation of authorities. Even, however, if any doubt formerly existed upon this point, it has been set finally at rest by the very recent case of Marion v. Weston, 119 S. E. 582, which case was decided by our state Supreme Court after the opinion of the referee was filed, and published after the argument before me.

[2] "In deference to the earnest contention of counsel that the mortgages should be sustained because of a previous agreement, or previous agreements, having the effect of creating equitable mortgages, I will, in addition to what the referee has said, briefly discuss that question. Attention is called to the following facts, which I find to be either without contradiction or by the weight of the testimony established in the case:

"The bankrupt was at the time of the transactions involved in the testimony, and had for some time been, principally, if not exclusively, engaged in farming. During a considerable portion of the time of the creation of the debts which were finally included in the mortgages to Mr. and Mrs. Pryor (and the creation of these debts included many transactions extending over a period of years), these parties, who are near relatives by marriage, lived in his home near the city of Anderson. For a considerable portion of the time he was regarded as possessing, and probably was possessed of, considerable property, and amply able to pay his debts. However, at the time of the execution of the mortgages, he was hopelessly insolvent, and was fully aware of the fact that under then existing conditions he had not sufficient property with which to meet his obligations. This is shown by both his admissions to various persons and by his attempts to compromise large claims due certain banks. He had been pressed for the payment of these claims and notified of imminent suit thereon. In view of his inability to meet these pressing demands, and with a full realization of his insolvency, he formed the design of preferring certain favored creditors by paying some in full, and by executing mortgages to others. In carrying out this design he included substantially all of his property in the scheme of preferential distribution. The manner in which this de-

sign was carried out, as well as his own statements in the testimony of his reasons for taking care of these favored creditors, is significant.

"It is apparent that the purpose was formed about the month of October, 1921, after threats of suit by the Farmers' & Merchants' Bank and the Farmers' Loan & Trust Company, then in liquidation, and in view of the impending, certain suits which they were threatening, one mortgage was given to Mr. and Mrs. Pryor, bearing date of October 20, 1921, to secure seven notes, four of which were dated in 1919, two in 1920, and one in 1921. This mortgage was recorded on October 29, 1921. Another mortgage was given to Mrs. Pryor bearing date October 29, 1921, and recorded the same date, to secure a note dated November 1, 1920. Another mortgage was given to Mrs. Corrie A. Watson, the mother of the bankrupt, which was dated and recorded October 29, 1921, and which was intended to secure eight notes running in date from August 9, 1919, to October 28, 1921. The above mortgages were on real estate, and among them included all of his real estate except his interest in remainder in 120 acres known as the home place of his father, which will be further discussed hereafter. He also on October 29, 1921, gave a chattel mortgage to Davis & McGee Mule Company which was recorded the same date. At this time the bankrupt claimed in his testimony that he owned about 150 bales of cotton, but the testimony convinces me that the amount was considerably less and that a considerable portion of the cotton that he did own had already been pledged to other parties. Whether that be true or not, in the scheme of disposition he proceeded to sell all the cotton which he had on hand and to appropriate proceeds of sale to chosen creditors.

"When the petition in bankruptcy was filed a few months later, he claimed to have on hand three bales of cotton, but it was never turned over to the trustee and the evidence indicates that it was nonexistent. A significant fact is that all the cotton sold during this time was sold by other parties than the bankrupt. The trustee states that there was no substantial change in the property of the bankrupt from the time of the execution of the mortgages to the date of the filing of the petition, and except for the sale of the cotton accounted for in the testimony, this testimony of the trustee is uncontradicted. An examination of the schedule shows that at the time of the filing of the petition in bankruptcy excluding the

three bales of cotton, which were never found, and excluding debts listed by him as worthless, the bankrupt then had on hand only about enough personal property, other than included in the Davis & McGee Mule Company's mortgage, to cover his homestead exemption. The only real estate owned by him beyond that included in the mortgages above referred to was his interest in remainder in the 120-acre tract of land, in which his mother had a life estate, and which was subject to the inchoate right of dower of his wife. Mr. Greene, the trustee, testified that in his opinion this land, if sold, would have to be subject to the life estate and dower interest, and would bring very little more, if any, than Mr. Watson's homestead. This testimony is uncontradicted. It appears, therefore, and I so find, that the bankrupt included in his scheme of preferences substantially and practically all of his property, and that he did so with the fraudulent purpose of preferring these favored creditors over his general creditors.

"The referee holds, and properly holds, that the mortgagees, Mrs. Watson and Mr. and Mrs. Pryor, are persons of good repute, and they are acquitted of any charge of personal fraud in accepting the mortgages. They are, however, denied under the law the benefit of a preference created by the fraudulent conduct of the mortgagor.

[3] "In determining whether the evidence is sufficient to establish an equitable mortgage in favor of the claimants, the mortgages must be considered separately. In the case of Mrs. Watson it is apparent that no such agreement was made. She did not even know of the mortgage or the intention until after it had been recorded and presented to her. The fact that she had a right of lien upon specific crops for rents would give no right in equity to the claim of a lien upon other property and property of a different character. In the case of Mr. and Mrs. Pryor the evidence does tend to show that certain conversations were had with reference to the giving of security, but the evidence fails to measure up to that degree of specific certainty that the law requires. The transaction is one between parties closely related by ties of family connection, and by association together in the same home as members of one family. In such cases the law will not presume a fraudulent purpose, but the relationship demands that the facts be closely scrutinized and the agreement definitely and specifically established. In re Stiger, 209 F. 148, 126 C. C. A. 96; National Bank v. Moore, 41 Am. Bankr. Rep.

409, 247 F. 913, 160 C. C. A. 103; 36 Cyc. 619, 726; 23 Corpus Juris, 24; 25 R. C. L. 337, 338; McMillan v. McMillan, 77 S. C. 516, 58 S. E. 431; Mann v. Poole, 40 S. C. 11, 18 S. E. 145, 889.

"I am convinced from a perusal of the testimony that the conversation between the parties was not of such character as to show a firm and binding agreement. Mrs. Pryor's testimony is to the effect that, because of her father's advice, she would not advance money to her own husband without taking a mortgage, and that she would not have sold the Crawford place to her son-in-law on a credit, if she had known what he owed to other parties. This indicated conclusively to my mind that she extended credit and failed to take the mortgage because she regarded Mr. Watson as perfectly solvent and his plain note as good. If it had been otherwise, it is indeed strange that, having procured counsel to draw the deed to the Crawford place, instruction was not given to the same counsel at the time to prepare and have executed the mortgage. Furthermore, it seems inconceivable that money should have been advanced so frequently as was testified to, and over such a long period of time, without requiring the execution of the promised mortgage as and when further advancements were made. It will be observed that, when the mortgages were executed, no pressure was being exerted upon the mortgagor to give them, nor indeed any request to that effect, but that the initiative was taken by him entirely. The bankrupt himself testified that one of his reasons for not giving the mortgages was that he expected to liquidate the claims out of a sale of the cotton, of which, at times, he had a large amount on hand, and for the purchase of which a considerable portion of the notes was given.

"I am unable to reconcile the idea that the parties entered into an absolute agreement, with a specific certainty as to details of the transaction, of giving necessary mortgages, with the conduct of the parties, the delay in enforcing the agreement as renewed opportunities presented and as new money was advanced, and with the further fact that in one instance certain cotton was pledged to Mrs. Pryor, who in turn left the disposition of it to her son-in-law. The whole testimony indicates to my mind that the case is one in which persons closely related extended credit because of that fact, and because of the supposed solvency of the debtor, and for the same reason submitted and delegated to him the decision of fur-

nishing security both when and if at all. This view is sustained, not only by the conduct of the parties during the long period of the extension of credits, but also at the time that the papers were given, when the mortgagor took the entire initiative, and although it does not appear that he had made known his purpose to counsel, who now represents the Pryors, yet, his original testimony showed beyond a doubt that it was his intention to provide counsel for protecting their claims, and that he anticipated that the assistance of counsel would be necessary.

"A full review of the facts would unnecessarily prolong this opinion. I am convinced that the referee was correct, both in his findings of fact and conclusions of law. Whereupon, after due consideration, it is ordered and adjudged that the order of the referee be and the same is hereby approved and confirmed, and that the petitions for review be and they are hereby dismissed."

A. H. Dagnall, of Anderson, S. C., for appellants.

Samuel L. Prince and T. Frank Watkins, both of Anderson, S. C. (Watkins & Prince, of Anderson, S. C., on the brief), for appellee.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

PER CURIAM. The reasoning of the referee on the law and facts is convincing of the correctness of his findings. Nothing can be added to the opinion of the District Judge on the only point not fully covered in the report of the referee.

We think the decree is right, and it is affirmed.